OFFICER— THIS ACCIDENT OCCURRED AS THE DRIVER OF VEH. #2 ATTEMPTED TO CHANGE LANES, VEH. #2 STRUCK VEH. #1 IN THE LEFT REAR AS IT WAS CHANGING LANES. VEH. #1 SPUN AROUND IN FRONT OF VEH. #2 AND COME TO REST IN THE MEDIAN. BOTH VEHICLES WERE ON THE SHOULDER WHEN I ARRIVED.

DRIVERS

#1 " I WAS CHANGING LANES, WHEN I PULLED OVER TO THE OTHER LANE, I STRUCK HIM IN THE LEFT REAR. I CHECKED BOTH MIRRORS AND DIDN'T SEE HIM."

#2 " I WAS WEST-BOUND AND HE PULLED OVER + HIT ME IN THE LEFT REAR."

| FIELDS NOT USED | NAME | CHARGE | AR. NO. / SUMMONS | COURT | DATE |
|---|---|---|---|---|---|
| | 1. | | | | |
| | 2. | | | | |

30. PHOTOS YES ☐ NO ☒ #_____ RECONSTRUCTION YES ☐ NO ☒ #_____

31. Submitting Agency Use Only **(FIELD NOT USED BY PATROL)**

ALAGOLD CORPORATION, an Alabama corporation, Plaintiff,

v.

Michael R. FREEMAN, et al., Defendants.

No. Civ.A. 98–A–33–N.

United States District Court, M.D. Alabama, Northern Division.

Oct. 21, 1998.

Order Denying Reconsideration Oct. 29, 1998.

Robert W. Bradford, Joana S. Ellis, Montgomery, AL, for Plaintiff.

Simeon F. Penton, JoClaudia Mitchum, Montgomery, AL, for Defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. *INTRODUCTION*

This cause is before the court on a Motion for Summary Judgment filed by Defendants Michael R. Freeman ("Freeman") and Ken-Tex Sales ("KenTex") (collectively, "Defendants").

In this case, Alagold Corporation ("Alagold"), an Alabama corporation, brings an action for equitable relief and money damages against Freeman, a Texas citizen, and KenTex, a Texas corporation. Plaintiff Alagold brings a six count Complaint against Defendants, alleging violations of Alabama state law.[1] Counts I and II allege that Defendants intentionally interfered with Alagold's contractual and business relations and conspired to thus interfere. Counts III and IV allege that Defendants misappropriated Alagold's trade secrets and proprietary information, and conspired to do so. Count V alleges that Freeman breached his fiduciary duties to Alagold. Finally, Count VI alleges that Defendants suppressed material facts.

Defendants have filed a Motion for Summary Judgment contending that Alagold has failed to state any viable claims against Defendants. First, Defendants claim that Alagold has failed to state a prima facie case of intentional interference with contractual or business relations, and that, since the underlying claim of intentional interference is not viable, the conspiracy claim based upon intentional interference must also fail. Defendants further contend that Alagold has failed to carry its burden to show that any information obtained by Defendants was a trade secret within the meaning of the statute and that, since the underlying claim of misappropriation of trade secrets is not viable, the conspiracy claim based upon misappropriation must also fail. Freeman contends that, as an at-will-employee, he had no duty to refrain from resigning and entering into a

competing business, and thus, he did not breach any fiduciary duty to Alagold. Finally, Defendants contend that Alagold has failed to state a prima facie case in support of its claim for suppression of material facts.

### II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by · [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the

---

1. This testimony reflected Freeman's understanding that certain types of information to which he had access at Alagold are sensitive and can give a competitive advantage, and that he would make sure, as a good manager and corporate officer, that his employees were aware that such information was to be kept within the company and not shared with competitors. *See* Freeman Depo. at 113, 116–17, 119–21 and 129–34.

other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). For the reasons stated herein, Defendant's Motion for Summary Judgment is due to be granted in part and denied in part.

## III. *FACTS*

Alagold manufactures tapestry pillows in Montgomery, Alabama. Pl.'s Br.[2] at 1. KenTex operates a home decorative manufacturing plant and brokerage business in Dallas, Texas. Defs.' Br. at 2. KenTex manufactures and sells numerous home decorative products, including tapestry pillows. *Id.* KenTex has been manufacturing decorative pillows since 1991; KenTex, however, did not enter the tapestry pillow manufacturing business until 1997. *Id.* at 2; Pl.'s Br. at 2 and Ex. F, Faulkner Dep., at 68, 123. Both companies offer their decorative tapestry pillows for sale throughout the United States and are direct competitors in this market. Defs.' Br. at 2–3; Pl.'s Br. at 2.

Named individual Defendant Freeman was employed as the Executive Vice President and General Manager of the Riverdale (Decorative Products) Division of Alagold from November 1992 through April 1997. Pl.'s Br. at 2; Defs.' Br. at 3. The employment contract between Freeman and Alagold did not contain a confidentiality agreement, a non-compete agreement or any other provision to limit Freeman's future use of any information he learned while in the employ of Alagold. *See* Defs.' Br. at 3 and Ex. A, Freeman's Alagold employment contract. The contract did not specify a definite term and was therefore terminable at will. *Id.; see also Udcoff v. Freidman,* 614 So.2d 436, 438 (Ala.1993) (noting that "without a clear and unequivocal offer of employment for a specific time or for the employee's lifetime, the contract is merely for at-will employment.").

The details surrounding Freeman's last few months of employment with Alagold are contested and somewhat convoluted. Alagold contends that on or before December 6, 1996, Freeman entered into an agreement with KenTex that Freeman would resign from Alagold and work for KenTex. Pl.'s Br. at 3. On December 7, 1996, Freeman and his wife signed a contract to purchase a home in Garland, TX, near KenTex's principal place of business. *Id.* at 6 and Ex. C, Kennedy Dep., at 124.

It is, however, undisputed that on January 15, 1997, Freeman and KenTex entered into a written employment contract which provided that Freeman would commence employment with KenTex on or before February 15, 1997. Pl.'s Br. at 6 and Ex. M. Freeman alleges that he subsequently re-negotiated with KenTex to begin work in April of 1997, but the written contract was never modified to reflect the revised employment date. *Id.;* Defs.' Br. at 3. The reasons for the date change are contested. Alagold contends that this time gave Freeman time to purloin proprietary information for use by KenTex and to unlawfully collect a bonus, severance pay and four months' salary. Pl.'s Br. at 3. Defendants, on the other hand, claim that Freeman requested this time "to properly conclude matters with Alagold." Defs.' Br. at 3. Neither Freeman nor KenTex informed Alagold about Freeman's employment contract with KenTex until April 4, 1997. Pl.'s Br. at 3.

On January 21, 1997, while Freeman was still employed by Alagold, KenTex transferred $33,000 to Freeman for "relocation expenses." Pl.'s Br. at 6 and Ex. C, Kennedy Dep., at 58. $15,000 of this amount was a loan while the remaining $18,000 appears to have been advance compensation. *Id.* Freeman accepted this money and used it as a down payment on his new home in Texas. At that time, Freeman had not notified Alagold of his pending resignation and new employment. Finally, more than two months

---

**2.** "Pl.'s Br." refers to Plaintiff Alagold's Brief in Opposition to Defendants' Motion for Summary Judgment. "Defs.' Br." refers to Defendants Freeman's and KenTex's Brief in Support of Defendants' Motion for Summary Judgment.

later, on April 4, 1997, Freeman resigned from Alagold and informed Alagold about his new position with KenTex. Pl.'s Br. at 7 and Ex. B, Freeman Dep., at 296

Freeman then started his new position as Executive Vice President of Operations and Administration at KenTex. Pl.'s Br. at 7 and Ex. B, Freeman Dep., at 296. Thereafter, several of Alagold's employees, consultants, sales representatives, suppliers and other business associates accepted employment or began doing business with KenTex. *See* Pl.'s Br. at 7–8. Alagold contends that KenTex and Freeman used Alagold's proprietary information, including trade secrets, to, in effect, "clone" Alagold's business. *Id.* at 4. Defendants admit that they are doing business with many of Alagold's current and former business associates but maintain that their actions have been lawful.

## IV. *DISCUSSION*

### A. *Breach of Fiduciary Duty (Count V)*

Alagold contends that Freeman, the individual named Plaintiff in this action, breached his fiduciary duty to Alagold. Freeman, as Executive Vice President of Alagold and General Manager of the Riverdale Division, owed a fiduciary duty to Alagold. *See* Ala. Code § 10–2B–8.42 (1994). Under this section:

(a) An officer with discretionary authority shall discharge his or her duties under that authority:

(1) In good faith;

(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) In a manner he or she reasonably believes to be in the best interests of the corporation.

*Id.* Alagold further explains this fiduciary duty by quoting from this court's opinion in *Enstar Group, Inc. v. Grassgreen:*

Corporate directors and officers have been variously described as trustees, fiduciaries, and agents of their corporation and stockholders. As such, they owe their corporations complete loyalty, honesty, and good faith; their first duty is to act in all things of trust wholly for the benefit of the corporation, and this encompasses a duty to disclose information to those who have a

right to know the facts. *See* Fletcher Cyc. Corp. § 838 (Perm.Ed.), and numerous cases cited therein.

In *Belcher v. Birmingham Trust National Bank,* 348 F.Supp. 61 (N.D.Ala. 1968), Judge Grooms described the relationship as follows:

Although not technically trustees, the duties of officers and directors are analogous to those of trustees. They are required to act with fidelity and good faith, subordinating their personal interests to the interests of the corporation.... They occupy a quasi fiduciary relation to the corporation and its stockholders....

The Supreme Court of Alabama in *Jones v. Ellis,* 551 So.2d 396, 401 (1989) quoted from *Belcher* with approval and quoted further from its earlier case of *Holcomb v. Forsyth,* 216 Ala. 486, 113 So. 516 (1927) as to the role of corporate directors:

The entire management of corporate affairs is committed to their charge, upon the trust and confidence that they shall be cared for and managed within the limits of the powers conferred by law upon the corporation and for the common benefit of the stockholders. They are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their best care and judgment, and to exercise the power conferred solely in the interest of the corporation. Clothed with the power of controlling the property and managing the affairs of the corporation, without let or hindrance, as to third persons, they are agents, but, as to the corporation itself, equity holds them liable as trustees.

Fletcher states that, "The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation." Fletcher Cyc. Corp. § 838. P. 181 (Perm.Ed.)

These are not obscure rules of law that must be found by lawyers and judges for the purposes of lawsuits. They are basic

concepts of our economic system which are known, or instinctively assumed, by all who participate in it.

812 F.Supp. 1562, 1569–70 (M.D.Ala.1993).

■ Defendants factually distinguish *Enstar* from the case at hand. While the court agrees that the cases are factually divergent, the court notes that the *Enstar* opinion accurately describes the standard by which a corporate officer's actions are to be judged. The court also notes that as Executive Vice President and General Manager of the Riverdale (Decorative Products) Division of Alagold, Freeman was an officer with discretionary authority who was required to act in accordance with the standard of care required by Ala.Code § 10–2B–8.42 (1994).

■ Alagold contends that Freeman breached his fiduciary duty to Alagold by his acceptance of employment with and compensation from KenTex without informing Alagold of his intentions to leave Alagold and work for one of its competitors. As Defendants note, Freeman did nothing wrong by accepting employment with KenTex. Under Alabama law, an at-will employee, like Freeman, does not owe his employer a fiduciary duty to refrain from resigning and entering into a competing business. *Allied Supply Co. v. Brown,* 585 So.2d 33, 35 (Ala.1991). Had Freeman simply resigned without notice to Alagold with the intention of accepting employment with KenTex, this court would be required to grant summary judgment in his favor on this count.

■ Freeman, however, did more than resign without notice to work for a competitor. Freeman accepted a payment of $33,000.00 from that competitor more than three months before resigning or even informing Alagold of his intention to resign, and continued to work as Alagold's Executive Vice President and Division General Manager while secretly under contract to go to work for the competitor. Given these facts, a reasonable jury could find that Freeman failed to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and/ or in a manner he reasonably believed to be in the best interests of Alagold. Defendant Freeman's Motion for Summary Judgment on Count V is therefore denied.

## B. *Suppression of Material Facts (Count VI)*

Alagold contends that Defendants unlawfully suppressed material facts from Alagold. Under Ala.Code § 6–5–102 (1993), "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Interpreting this statute, the Alabama Supreme Court has held that the elements of a claim for fraudulent suppression are: (1) that the defendant was under a duty to disclose a material fact (2) which the defendant concealed or failed to disclose, (3) inducing the plaintiff to act or to refrain from acting, and (4) causing damage to the plaintiff as a proximate consequence. *Booker v. United American Ins. Co.,* 700 So.2d 1333, 1339 (Ala.1997).

■ Alagold contends that both Freeman and KenTex had a duty to disclose material facts to Alagold. In order to find that Defendants had a duty to disclose, however, this court must determine that the confidential relations of the parties or the particular circumstances of this case impose such a duty. A duty to speak can arise depending upon the relation of the parties, the materiality of the particular fact and the relative knowledge of the parties. *Trio Broadcasters, Inc. v. Ward,* 495 So.2d 621, 624 (Ala. 1986). Before an obligation to disclose can be imposed, the relationship between the parties, "while not necessarily required to be confidential, must nonetheless be such that a disclosure of material information is dictated." *Id.*

■ The court must apply this guidance to determine whether a confidential relationship existed between Alagold and Freeman and between Alagold and KenTex. Under this rule, Freeman, as a corporate officer who had a fiduciary duty to Alagold, was certainly in a confidential relationship with Alagold. Defendants cite *Allied Supply Co. v. Brown,* for the proposition that it is not a violation of an employee's fiduciary duty to prepare to enter into competition with his employer without providing prior notice. As noted above, however, Freeman's conduct went be-

yond preparing to enter into competition with Alagold. Freeman therefore, upon accepting compensation from KenTex and entering into an employment contract with it while still in Alagold's employ, had a duty to communicate this fact to Alagold.

■ KenTex's relationship with Alagold is far different from Freeman's. KenTex and Alagold are competitors. None of the information provided to the court reveals that KenTex and Alagold ever negotiated, let alone entered into a confidential relationship, with one another. Under these facts, their relationship is not such that a disclosure of material information is dictated. Summary judgment is therefore granted to KenTex on Alagold's fraudulent suppression claim (Count VI).

■ Defendants claim that Alagold has failed to show that it was injured as a result of any alleged suppression. Alagold, however, alleges that it was injured by continuing to put its complete trust in Freeman, allowing him access to its confidential business practices and strategies and proprietary information regarding customers, suppliers, designers, artists, pricing, advertising, marketing, manufacturing processes and overall corporate strategy. Alagold further states that, had Freeman made them aware of all material facts, he would have been fired and that the suppression of these facts induced Alagold to refrain from acting. The continued trust in Freeman, Alagold contends, gave Freeman additional time to learn and remember information important in Alagold's business to be used for the benefit of KenTex. A reasonable jury could find that, given Freeman's intention to leave Alagold to work for its competitor and his acceptance of compensation from that competitor during his employment with Alagold, Freeman's failure to disclose these facts induced Alagold to rely on his continued loyalty, to Alagold's detriment. Freeman is therefore not entitled to summary judgment on the claim of suppression (Count VI).

**3.** The competitor's privilege is a special form of justification for interference, which can negate the fourth element of a plaintiff's claim. *Soap*

## C. *Intentional Interference with Contractual and Business Relations (Count I)*

■ Alagold alleges that the Defendants have tortiously interfered with Alagold's contractual and business relations. Specifically, Alagold complains that KenTex and Freeman interfered with Alagold's sales representatives, employees, consultants and a supplier by employing and/ or contracting with them. To establish a claim for tortious interference with contract, Alagold must demonstrate (1) the existence of a contract or business relations; (2) the defendants' knowledge of the relationship; (3) intentional interference in that relationship by the defendant; (4) an absence of justification for the interference; and (5) damage to plaintiff as a result of defendant's interference. *Soap Co. v. Ecolab*, 646 So.2d 1366 (Ala.1994).

■ Defendants contend that Alagold has failed to establish at least two elements of the claim: intentional interference and resulting damage. Defendants also contend that their conduct, if it rises to the level of interference, was justified and proper within the competitor's privilege doctrine.[3]

■ The court need not, however, address Defendants' arguments in regard to all of the intentional interference claims, as the Alabama Supreme Court's decision in *Defco, Inc. v. Decatur Cylinder, Inc.*, 595 So.2d 1329 (Ala.1992) is dispositive as to Alagold's claims of tortious interference regarding Alagold's former employees and consultants who were hired by KenTex. In *Defco*, the Alabama Supreme Court noted that it found no Alabama case which had allowed an action for intentional interference with contractual or business relations where a defendant had hired the plaintiff's employee, in the absence of an agreement by the employee not to compete with the plaintiff. *Id.* at 1331. The court noted that "[w]ithout a showing that the employee had an enforceable noncompetition agreement with the plaintiff or that the defendant did more than simply hire its competitor's employee, we see

*Co.*, 646 So.2d at 1371. Thus, competitor's privilege is an affirmative defense, a question to be resolved by the trier of fact. *See id.*

no basis for allowing an action for intentional interference...." *Id.* at 1332. Alabama law therefore does not recognize a claim for tortious interference with business or contractual relations for a defendant's hiring of a plaintiff's employees, absent a non-compete agreement between the plaintiff and its employees.

■ Applying the *Defco* rule to the present case, some of Alagold's claims for tortious interference with contractual or business relations must fail. Neither of Alagold's former employees who were hired by KenTex, Cassandra Faulkner nor Carl Nelson, even had a written contract with Alagold. *See* Goldman Depo. at 101–02, 115–16. They were not parties to any contract, let alone one containing a non-compete agreement, with Alagold. Alagold cannot maintain claims for tortious interference with contractual or business relations against Defendants on the basis of KenTex's hiring of these two former Alagold employees.

Alagold also alleges that Defendants interfered with Alagold's contractual or business relations with Alagold's consultants.[4] As Defendants note and Alagold does not contest, none of these consultants were parties to contracts with Alagold containing non-compete agreements when they went to work for KenTex. As to these consultants, Alagold fails to state valid claims of intentional interference with business or contractual relations.

■ Alagold also alleges that KenTex intentionally interfered with Alagold's business or contractual relations with numerous Alagold sales representatives by hiring them to sell KenTex's products. Alagold's contracts with its sales representatives prohibit them from selling products which are "directly competitive with the product lines of Alagold...." *See* Defs.' Br. at Ex. C, ¶ 6. Claims of tortious interference are allowed against a new employer for interference with such covenants. *James S. Kemper & Co. Southeast, Inc. v. Cox & Assocs., Inc.,* 434 So.2d 1380, 1383 (Ala.1983). Defendants point out, and the court notes, however, that nothing in Alagold's sales contracts require its sales representatives to refrain from competing with Alagold after the termination of the sales contract.[5] Yet, if Defendants employed Alagold's sales representatives during the term of the sales representatives' contracts with Alagold, Defendants may be liable for tortious interference with contractual relations for inducing a breach of the non-competition clause.

Alagold has not produced signed copies of these sales representative contracts and does not even specify the names of the sales representatives with whose contracts it accuses Defendants of interfering. Alagold has, however, alleged the existence of some sales contracts which contain a non-competition agreement. *See* Goldman Depo. at 44. The court finds that this evidence, while admittedly thin, is enough to create a question of material fact as to the existence of such contracts and Defendants' interference therewith, preventing the entry of summary judgment in Defendants' favor on Alagold's claim of tortious interference with contractual relations with Alagold's sales representatives.

■ Alagold's final claim for tortious interference with business or contract relations is based on Defendants' alleged interference with Alagold's relations with its suppliers. Defendants contend that Alagold has failed to establish at least two elements of the claim: intentional interference and resulting damage. As to this claim of interference with Alagold's relationship with its suppliers, the court must agree with Defendants. As Alagold's President and Chief Executive Officer noted, Alagold has maintained relationships with all of its suppliers, and Alagold has not had any difficulty purchasing sup-

4. This list of "consultants" includes artists, computer consultants and an engineering consultant.

5. Alagold's sales representative contracts require sixty (60) days' notice for a valid termination. *See* Defs.' Br. at Ex. C, ¶ 3. Defendants have produced evidence that two of these sales representatives, Mark Burke and Bob Theil, terminated their contracts with Alagold before entering into sales agreements with Alagold. Defendants have not, however, produced evidence that either of these sales representatives complied with the sixty days' notice requirement. If they did not validly terminate their contracts with Alagold, then they breached their agreement with Alagold. If, as Alagold alleges, KenTex induced these breaches, KenTex could still be found liable for intentional interference with these contracts.

plies or raw materials. Goldman Depo. at 148. Given these facts, Alagold has failed to state a prima facie case of tortious interference with business or contractual relations for Defendants' purchase of supplies from Alagold's suppliers, and Defendants' Motion for Summary Judgment on the tortious interference with business relations claim, insofar as it relates to Alagold's suppliers, is due to be granted.

In sum, Defendants' Motion for Summary Judgment is due to be granted as to all of Alagold's claims for tortious interference with contractual or business relations, except for the claims relating to Alagold's sales representatives.

### D. *Conspiracy to Interfere with Contractual and Business Relations (Count II)*

 Under Alabama law, a conspiracy is a combination to accomplish an unlawful end or to accomplish a lawful end by unlawful means. *Scott v. Commonwealth Land Title Ins. Co.*, 518 So.2d 102 (Ala.1987). Alagold has argued that Freeman and Ken-Tex conspired together to interfere with Alagold's contractual and business relations. Specifically, Alagold contends that Defendants conspired to raid Alagold of employees, consultants, sales representatives, artists, designers and others in order to "clone" Alagold's decorative tapestry pillow business. This is evidenced by KenTex's hiring of or contracting with approximately fifteen of Alagold's business associates within several months after Freeman left Alagold and started working for KenTex. *See* Pl.'s Br. at Ex. K, ¶ 7.

 Defendants point out that a conspiracy alone furnishes no cause of action, but rather, a conspiracy claim relies on the underlying wrong committed. *Scott*, 518 So.2d at 104. Defendants contend that no underlying wrong has been established in this case. This court, however, has found

that, at this stage in the proceedings, Alagold has provided sufficient evidence for a reasonable fact finder to conclude that at least one underlying wrong occurred in the context of Alagold's tortious interference claim. Defendants' Motion for Summary Judgment as to Count II is therefore denied.

### E. *Misappropriation of Trade Secrets and Proprietary Information (Count III)*

Alagold asserts a state law claim based on the Alabama Trade Secrets Act. Under Alabama Code § 8–27–3 (1993), a person who discloses or uses the trade secret of another, without privilege to do so, is liable for misappropriation of the trade secret if:

(1) That person discovered the trade secret by improper means;

(2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;

(3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2) above; or

(4) That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake.

Alagold contends that Freeman's disclosure and use of proprietary information,[6] which he had access to as Executive Vice President of Alagold and General Manager of the Riverdale Division, for the benefit of KenTex, constituted a misappropriation of trade secrets.

While Freeman undoubtedly took information with him from Alagold to KenTex, in order for any of that information to be protected under the Alabama Trade Secrets Act, it must meet the definition of a "trade se-

---

**6.** Alagold claims that this proprietary information which should be protected under the Alabama Trade Secrets Act includes the accumulation of expertise in: "the design of its manufacturing line; manufacturing processes; computer software; building of a sales and distribution force; developing business strategies; developing relationships with and knowledge of its customers and potential cus-

tomers and their needs, including ... pricing and advertising; marketing of the products; design and artwork relating to the products; developing relationships with and knowledge of suppliers and their pricing structures; customer lists; vendor lists; designers and artists." Pl.'s Br. at 18 and Ex. A, Goldman Aff.

cret." Under Alabama law, a "trade secret" is information that:

 a. Is used or intended for use in a business;

 b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique or process;

 c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

 d. Cannot be readily ascertained or derived from publicly available information;

 e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

 f. Has significant economic value.

Ala.Code § 8–27–2(1) (1993). Defendants contend that the information taken by Freeman to KenTex does not meet this definition because Alagold did not take reasonable efforts to ensure the secrecy of the information and because this "head knowledge"[7] does not satisfy the embodiment requirement.

This court agrees with Defendants' first contention. Alagold, on the other hand, alleges that the information that Freeman took was the subject of reasonable efforts to ensure secrecy. In support of this contention, Alagold notes that: the information was not freely accessible to all employees at Alagold, but rather, was available only on a need-to-know basis; the information is maintained in designated file cabinets in the administrative offices, where only employees who require such information are permitted access;[8] and these offices are locked after regular business hours.[9]

In *Allied Supply Co., Inc. v. Brown*, 585 So.2d 33 (Ala.1991), the Alabama Supreme Court evaluated the reasonableness of the efforts by a company to maintain the secrecy of customer and vendor lists which were taken by the defendants. The defendants were former employees of the plaintiff, and the defendants used information from these lists to compete with the plaintiff. The Alabama Supreme Court noted that at least ten (10) employees had free access to the lists, the lists were not marked "confidential," the lists were taken home by employees, multiple copies of each list existed, and the information on the lists was in the receptionist's Rolodex file. *Id.* at 36. In light of that evidence, the court found that the company did not meet its burden of showing that it had taken reasonable steps to ensure that the lists remained a "trade secret." *Id.*

 While the evidence of lack of secrecy is different in the present case, some of the same problems are present with Alagold's purported secrecy efforts. At Alagold, employees who need to know secret information have free access to it, and none of the filing cabinets containing such information are locked. There is no evidence that Alagold's proprietary information was marked "confidential" or that Alagold communicated to its employees that such proprietary information was to be kept confidential. This court finds another factor important in the evaluation of Alagold's efforts to maintain the secrecy of its confidential information. Alagold, which employed Freeman as an Executive Vice President and General Manager of a products division and gave him full access to all of Alagold's confidential information, did not re-

---

**7.** As Defendants note, commentators have coined the term "head knowledge" to refer to memory or general knowledge gained through employment experience. The only document Freeman is alleged to have removed from Alagold is a copy of its annual financial statement, which was given to him for use in calculating his year-end bonus.

**8.** The only exception to this storage arrangement is the annual financial statement given to Freeman. Alagold did not, however, mark this financial statement as "confidential" or instruct any employee, including Freeman, to keep the statement confidential. The court finds, therefore, that Alagold did not take reasonable steps to

ensure the secrecy of this document and that it is not a trade secret. *See Allied Supply Co., Inc. v. Brown*, 585 So.2d 33 (Ala.1991) and discussion infra.

**9.** These facts are stated in an affidavit executed by Goldman on September 4, 1998. Defendants have filed a Motion to Strike the affidavit on the ground that it contradicts previously given clear testimony without explanation, in an attempt to create a material question of fact. *See Van T. Junkins & Associates, Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984). Because of the conclusion the court reaches below, without reaching the merits of the motion, it is denied as moot.

quire Freeman to execute a confidentiality or non-compete agreement limiting the use of information Freeman learned during his employment with Alagold.

Given these facts, it cannot be said that Alagold undertook reasonable efforts under the circumstances to maintain the secrecy of its information. Thus, Alagold has not satisfied its burden of establishing that such information satisfies the requirements to be a "trade secret," and the information is not entitled to protection under the Alabama Trade Secrets Act. Defendants' Motion for Summary Judgment on Count III is granted.

### F. Conspiracy to Misappropriate Trade Secrets and Proprietary Information (Count IV)

■ As discussed in section D. above, under Alabama law, a conspiracy is a combination to accomplish an unlawful end or to accomplish a lawful end by unlawful means. *Scott v. Commonwealth Land Title Ins. Co.*, 518 So.2d 102 (Ala.1987). In a conspiracy claim, the conspiracy itself furnishes no cause of action, but is dependent upon the underlying wrong committed. *Id.* at 104. Alagold contends that Defendants conspired to misappropriate Alagold's trade secrets and proprietary information. This court found above in section E., however, that no underlying wrong was committed in the context of Alagold's misappropriation claim. Defendants' Motion for Summary Judgment as to Count IV is therefore granted.

### V. CONCLUSION

For the reasons discussed above, the court concludes that Defendants' Motion for Summary Judgment is due to be GRANTED in part and DENIED in part. A separate order will be entered in accordance with this memorandum opinion.

### ORDER

This case is before the court on a Motion to Reconsider filed by Plaintiff Alagold Corporation ("Alagold") on October 27, 1998. Alagold requests that the court reconsider its grant of summary judgment as to Alagold's claim for misappropriation of trade secrets and proprietary information.

Alagold specifically requests that the court reconsider two grounds upon which it relied in determining that Alagold did not undertake reasonable efforts under the circumstances to maintain the secrecy of its information in accordance with Ala.Code § 8–27–2(1)e. (1993). First, Alagold contends that Defendant Michael R. Freeman's ("Freeman") deposition testimony [1] provides evidence that Alagold communicated to its employees that certain information should be kept confidential. Second, Alagold contends that the court was mistaken in its consideration of the lack of a confidentiality agreement in Freeman's employment contract as a factor in evaluating whether Alagold took reasonable steps under the circumstances to maintain the secrecy of its information.

Alagold's first ground for reconsideration, Freeman's deposition testimony, was considered by the court in reaching its determination that Alagold had not taken reasonable steps to maintain secrecy. The court did not address Freeman's deposition testimony in its Memorandum Opinion for several reasons. First, while Freeman's knowledge that certain information is sensitive and can give a competitive advantage might be evidence relevant to Alagold's breach of fiduciary duty claim, it does not in any way show that Alagold took steps to keep that information secret. Second, the fact that Freeman agreed that he would make sure that his employees were aware of the need for confidentiality does not show that Alagold took steps to keep information secret.[2] Finally, there is a difference between Freeman's acknowledgment that certain information should be confidential and the imposition of

---

1. Because the citizenship of Plaintiff and Defendants is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs, this court has jurisdiction over Alagold's claims under 28 U.S.C. § 1332.

2. Alagold appears to contend that Freeman was responsible for implementing its confidentiality program. Alagold, however, has not presented any evidence that Freeman was informed that one of his duties for Alagold was to implement a confidentiality program. Nor has Alagold produced any evidence that Freeman actually informed any Alagold employee of a need for confidentiality.

legal liability under the Alabama Trade Secrets Act for disclosure of such information.

As to Alagold's second ground for reconsideration, the court considered the lack of a confidentiality agreement in Freeman's employment contract with Alagold as a factor which showed a lack of communication from Alagold to Freeman that any information was to remain confidential. That lack of an explicit agreement regarding confidentiality is simply one factor which the court considered in determining that Alagold did not inform Freeman of any confidentiality policy. That factor, taken into account with others,[3] demonstrated that Alagold did not take reasonable steps, given the totality of the circumstances, to maintain the secrecy of its purported confidential or proprietary information.

For the above-stated reasons, it is ORDERED that Alagold's Motion to Reconsider is DENIED.

3. Among other factors considered by the court were the facts that Alagold employees who need to know secret information have free access to it, confidential information was stored in unlocked filing cabinets and none of this information was marked "confidential." *See* Memorandum Opinion of October 21, 1998 at 18.